IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH KOGUCKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 08 C 0983 |
| | ) | |
| METROPOLITAN WATER RECLAMATION | ) | |
| DISTRICT OF GREATER CHICAGO, | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Elizabeth Kogucki is an engineer for the Metropolitan Water Reclamation District of Greater Chicago ("District"). One day, while searching for some information she needed for a work project in her supervisor's computer files, she stumbled across something she wasn't expecting – a play. She read it, and found it lewd. She was offended by the way it depicted women and sex. She complained and asked to be transferred to another supervisor, got her wish, then changed her mind. A couple of years later, there was an open season on promotions, and Ms. Kogucki wanted one. She took a test and went through interviews. When she asked about her prospects, she was told she didn't have any because of her complaints. Over the next three years, eight people were promoted – she was not among them. Ultimately, she sued under Title VII, claiming the District had retaliated against her for her complaints. The District has moved for summary judgment.

The Seventh Circuit has said on more than one occasion that its formulae for resolving Title VII summary judgment motions is confusing. There is the direct method of proof, employing either direct or circumstantial evidence *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 594 n.3 (7th Cir.

2008) *Rudin v. Lincoln Land Community College,* 420 F.3d 712, 720 n. 3 (7th Cir.2005)(observing that such confusion is understandable). Indeed, several of its own cases "arguably conflate the direct method with direct evidence." *Rogers v. City of Chicago,* 320 F.3d 748, 754 (7th Cir. 2003). And while circumstantial evidence is not *direct,* the court has said it "must point *directly* to a discriminatory reason for the employer's action." *Petts v. Rockledge Furniture LLC,* 534 F.3d 715, 720 (7th Cir. 2008)(emphasis supplied, quotations omitted); *Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir.2004); *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir.2003).

The court's line of cases likening circumstantial evidence to a "convincing mosaic," *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 737 (7th Cir.1994), has fostered its own line of difficulties. In *Sylvester v. SOS Children's Villages Illinois, Inc.,* 453 F.3d 900, 903-04 (7th Cir. 2006), the court lamented that "it was not the intention in *Troupe* to promulgate a new standard, whereby circumstantial evidence in a discrimination or retaliation case must, if it is to preclude summary judgment for the defendant, have a mosaic-like character. There is no rich mosaic of circumstantial evidence of retaliation in this case, but there is enough (though maybe barely enough) to preclude summary judgment."

Then there are the cases covering stray remarks, derogatory comments, and epithets. While there is little confusion about the difference between a stray remark and a near-admission, there is something for everyone in the voluminous jurisprudence regarding timing of remarks, decisionmakers, etc., and that, as shall be seen, has played a significant role in this motion for summary judgment.

# I.
## FACTS

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions. Local Rule 56.1 requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). The party opposing summary judgment must then respond to the movant's statement of proposed material facts; that response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment." Local Rule 56.1(b)(3)(C); *Ciomber*, 527 F.3d at 643. District courts are " 'entitled to expect strict compliance' " with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does follow the Rule's instructions. *Ciomber*, 527 F.3d at 643; *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir.2004).

The District has violated the Rule by filing a statement of facts consisting of eighty-eight numbered paragraphs, without the required leave of court. Local Rule 56.1(a). That would be reason enough to deny its motion. But, as district courts have discretion to enforce their local rules and to excuse transgressions, *Little v. Cox's Supermarkets,* 71 F.3d 637, 641 (7th Cir.1995), the motion will be resolved on its merits.

Elizabeth Kogucki began her tenure with the Metropolitan Water Reclamation District or Greater Chicago in September of 1989 as an engineering draftsman II. (*Defendant's Local Rule 56.1*

Statement of Facts ("*Def.St.*"), ¶ 2; *Plaintiff's Response* ("*Pl.Res.*"), ¶ 2). She was promoted in 1994, in 1997, and in 2000, when she was made senior civil engineer, the position she currently holds. (*Def.St.*, ¶ 3; *Pl.Res.*, ¶ 3). In late 2003, Ms. Kogucki worked at the District's Calumet plant, while her direct supervisor, Tom Kunetz, worked at the downtown Chicago office. (*Def.St.*, ¶ 8; *Pl.Res.*, ¶ 8).

On September 22, 2003, Mr. Kunetz brought a diskette to the office that included a play he had written, in order to print it out on the office computer. (*Def.St.*, ¶ 4; *Pl.Res.*, ¶ 4). But after he printed it out, he left it in a computer folder with his name on it. (*Def.St.*, ¶ 4; *Pl.Res.*, ¶ 4). The play contained sexually explicit scenes and off-color language. (*Def.St.*, ¶ 4; *Pl.Res.*, ¶ 4). Worried that one of his colleagues might have accessed it, a few days later, Mr. Kunetz went to his supervisor, Osoth Jamjun, and disclosed what he had done. (*Def.St.*, ¶ 5; *Pl.Res.*, ¶ 5). Mr. Jamjun told him his unauthorized use of the computer was a violation of work rules, and that he may be subject to disciplinary action. (*Def.St.*, ¶ 5; *Pl.Res.*, ¶ 5).

As Mr. Kunetz feared, one of his colleagues *did* stumble across the play. Ms. Kogucki was working on a contract, and needed certain specifications for it. (Kogucki Deposition, at 12). She thought she might find a similar contract in Mr. Kunetz's computer folder. (*Id.*). The folders were shared folders and used by everyone for purposes like that. (Kogucki Deposition, at 14-15, 26). She clicked on his folder, then clicked on a subfolder, but does not recall the name of it. (Kogucki Deposition, at 12). She thought it might have included a number, which would have been the middle digits of a contract. (Kogucki Deposition, at 17). She clicked on that folder, and the play appeared on the screen. (Kogucki Deposition, at 19). She started to read it; she claimed she still thought it might be what she was looking for. (Kogucki Deposition, at 25). She couldn't say how much she

4

read before she realized otherwise. (Kogucki Deposition, at 25).

At her deposition, she said she read the entire play at that sitting. (Kogucki Deposition, at 38). But, a bit later in her testimony, she backpedaled:

> . . . now when I think about it, I could have given you the wrong answer. That I could have but not necessarily. I think there was a time when I started reading it and I couldn't even finish it because I didn't like what I read. So I don't know. I don't recall.

(Kogucki Deposition, at 39). She admitted having read the entire play when she printed it out. (Kogucki Deposition, at 38). That was a week after she had found it. (Kogucki Deposition, at 25-26, 35). By that time, having read the play at least once and perhaps twice over a week's period, she decided to make a complaint about it, because she felt offended and the material "was against the District directives." (Kogucki Deposition, at 35). She said the play was offensive and created a hostile work environment "because of the way women and sex with women is described, because of the body parts, women body parts that are described." (Kogucki Deposition, at 40).

Ms. Kogucki complained to Mr. Jamjun on October 2, 2003. (*Def.St.*, ¶ 6; *Pl.Res.*, ¶ 8). She asked for a transfer. (*Id.*). She didn't feel comfortable working with Mr. Kunetz because "what [she] read in the plays about women [she] related to [her]self, and felt that [was] the way Mr. Kunetz [saw her] as a woman. As an object, sex object." (*Id.*; Kogucki Deposition, at 47). Mr. Jamjun asked Ms. Kogucki if she wanted to file a sexual harassment complaint, and she yes. (*Def.St.*, ¶ 9; *Pl.Res.*, ¶ 9). Mr. Jamjun passed this along to Frances Wilkins, the District's EEO investigator. (*Id.*). Ms. Wilkins met with Ms. Kogucki that same day and, according to Ms. Kogucki, said that Mr. Kunetz had done nothing wrong because he didn't place the play on Ms. Kogucki's directory. (*Def.St.*, ¶ 11; *Pl.Res.*, ¶ 11).

The next day, October 3, 2003, Mr. Jamjun wrote Ms. Kogucki an e-mail stating that if she had not changed her mind about transferring, that she would be transferred to the Infrastructure and Budget Division. (*Def.St.*, ¶ 12; *Pl.Res.*, ¶ 12). Although she had requested a transfer just the day before, Ms. Kogucki e-mailed back this response:

> Since it is clear that I have done nothing wrong and was in fact trying to do the right thing, I should not be the one burdened with changing job location and complicating my personal life. Because of this, at this time, I will decline any transfer offers to the positions that would inconvenience my personal life.

(*Def.St.*, ¶ 12; *Pl.Res.*, ¶ 12; Kogucki Deposition, Ex. 6, at 1343). Ms. Kogucki testified that she thought Mr. Kunetz, her supervisor, should have been transferred. (*Def.St.*, ¶ 12; *Pl.Res.*, ¶ 12). Moments after she e-mailed Mr. Jamjun, she e-mailed Ms. Wilkins and said she saw no reason to meet with her further. (*Def.St.*, ¶ 12; *Pl.Res.*, ¶ 12; Kogucki Deposition Ex. 6, at 1342). Nothing more was said, or done, about the incident.

Two years passed. In June or July of 2005, Ms. Kogucki was told that her work location would change from Calumet to downtown where she would be in daily contact with Mr. Kunetz, who had been recently promoted to the head of a division. (*Def.St.*, ¶ 15; *Pl.Res.*, ¶ 15). On July 8, 2005, Ms. Kogucki met with the District's chief engineer, Joe Sobanski, about the transfer and expressed her concerns. She provided him with her two most recent performance ratings – from 2003 and 2004 – and a copy of Mr. Kunetz's play (which oddly she had kept although claiming to have been offended by it). (*Def.St.*, ¶ 16; *Pl.Res.*, ¶ 16). The 2003 rating was "meets standards" – but Ms. Kogucki said Mr. Kunetz had changed it from "exceeds standards." (*Def.St.*, ¶ 17; *Pl.Res.*, ¶ 17). Her 2004 rating, however, was also "meets standards." (*Id.*).

She told Mr. Sobanski that she no longer wanted to work under Mr. Kunetz's supervision, and requested a different transfer. (*Def.St.*, ¶ 16; *Pl.Res.*, ¶ 16). After their meeting, Ms. Kogucki followed up with an e-mail: "Thank you for meeting with me today and discussing my concerns regarding my professional future at the District and continuation of work under supervision of Mr. Kunetz. I hope that the review of my two ratings and materials placed on P-Drive by Mr. Kunetz will help the management to understand my situation." (*Id.*).

Next, on July 12th, Ms. Kogucki went to see Suzanne Boswick, the District's Equal Employment Opportunity/Training Manager, and claimed she had been subjected to a "pattern of retaliation" since October 22, 2003, when Mr. Kunetz changed her 2002/2003 performance rating from "highly effective" to "meets standards." (*Def.St.*, ¶ 19; *Pl.Res.*, ¶ 19). What happened was that Ms Kogucki met with her immediate supervisor for a performance evaluation, and apparently the rating they discussed was "highly effective." But the final, formal rating was the responsibility of Mr. Kunetz, who reviewed her performance from his perspective and rated her "meets standards." (Kogucki Deposition, Ex. 14). It must be noted that Ms. Kogucki's ratings under Mr. Kunetz were consistently "meets standards" since 2000, well before the play incident. (*Id.*).

On July 20, 2005, Ms. Kogucki met with Mr. Sobanski again and said that she did not want to work for Mr. Kunetz. (*Def.St.*, ¶ 19; *Pl.Res.*, ¶ 19). He offered to transfer her to the Sewer Design Section in the Engineering Department, but Ms. Kogucki declined, because if she remained in the engineering department, and Mr. Kunetz became chief engineer at some point, he would become her supervisor again. (*Def.St.*, ¶ 19; *Pl.Res.*, ¶ 19). So, Ms. Kogucki requested a transfer to a senior civil engineer position in the maintenance and operations department. Her request was denied (*Def.St.*, ¶ 19; *Pl.Res.*, ¶ 19), because according to Ms. Boswick there were no vacancies in

7

that department at the time. (Kogucki Deposition Ex. 14). On August 16, 2005, Ms. Kogucki transferred to the sewer design section of the engineering department and began working under Amreek Paintal. (*Def.St.*, ¶ 28; *Pl.Res.*, ¶ 28). After that, she never had to work on any projects with Mr. Kunetz personally. (*Def.St.*, ¶ 29; *Pl.Res.*, ¶ 29).

According to Ms. Kogucki, she told Mr. Sobanski that she had applied for the principal civil engineering promotion and hoped she'd be treated fairly. (*Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts* ("*Pl.St.*"), at ¶99). She claims he told her, "you will never be promoted because of your complaints." (*Def.St.*, ¶ 20; *Pl.Res.*, ¶ 20). She understood him to be referring to her complaints about Mr. Kunetz's plays. (*Def.St.*, ¶20; *Pl.Res.*, ¶20).[1] She also claims that he asked her if she was Catholic and offered to e-mail her some prayers because praying was the only hope she had. (*Def.St.*, ¶ 21; *Pl.Res.*, ¶ 21). And, that he told her if she didn't like the sewer section, he could find a worse place to transfer her. (*Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts*, at ¶95). Ms. Kogucki never mentioned these comments to anyone or complained about them until more than two years later. (*Def.St.*, ¶ 24; *Pl.Res.*, ¶ 24).[2]

The test for the principal civil engineer position had been given in May of 2005, and results had been posted on June 28th. (*Def.St.*, ¶ 30; *Pl.Res.*, ¶ 30). Twenty-nine candidates who had passed the exam and were eligible for the position were ranked in three categories: A, B, and C. (*Id.*). Just five placed in the A category, Ms. Kogucki among them. (*Def.St.*, ¶ 31; *Pl.Res.*, ¶ 31).

---

[1] Allegations of open admissions in cases like this are not uncommon. *See Maher v. City of Chicago*, 406 F.Supp.2d 1006, 1019 (N.D.Ill. 2006)(plaintiff's supervisor allegedly said "it would not be fair to promote plaintiff, a Naval Reservist, because someone else had to do his job while he was 'off gallivanting in Bosnia.'").

[2] Silence in the face of claimed statements like this is also not uncommon.

Next was the interview phase. Two maintenance & operations department employees conducted the interviews on July 18 and 19, 2005. (*Def.St.*, ¶ 32; *Pl.Res.*, ¶ 32). Neither was aware of Ms. Kogucki's problems with Mr. Kunetz or her complaints. (*Def.St.*, ¶ 33; *Pl.Res.*, ¶ 33). The candidates' performances were scored and ranked; Ms. Kogucki placed 11th out of seventeen A and B category candidates. (*Id.*). That placed her in the "qualified" category with regard to the interviews; the lowest of three categories, below "exceptionally well qualified" and "well qualified." (*Def.St.*, ¶ 34; *Pl.Res.*, ¶ 34).

The next hoop was an interview with three supervising civil engineers from the District's engineering department, also conducted on July 18th and 19th. (*Def.St.*, ¶ 35; *Pl.Res.*, ¶ 35). In this round, Ms. Kogucki placed fifteenth out of the seventeen A and B candidates. (*Def.St.*, ¶ 35; *Pl.Res.*, ¶ 35). This put her in the lowest of three categories for these interviews, category C, below categories A and B. (*Def.St.*, ¶ 37; *Pl.Res.*, ¶ 37). None of the interviewers was aware of her literary complaints. (*Def.St.*, ¶ 35; *Pl.Res.*, ¶ 35).[3]

---

[3] The District relies on the affidavits of the interviewers and their matrix of rankings as evidence of where the candidates were categorized in the two rounds of interviews. Ms. Kogucki objects to this as hearsay, but does not explain why, merely citing Rules 801 through 803 of the Federal Rules of Evidence. Since the argument is undeveloped, it is forfeited, as the Seventh Circuit has directed in an unbroken series of cases. *See e.g., White Eagle Co-op. Ass'n v. Conner*, 553 F.3d 467, 476 n.6 (7th Cir. 2009)(" . . . it is not the province of the courts to complete litigants' thoughts for them, and we will not address this undeveloped argument."); *Argyropoulos v. City of Alton*, 539 F.3d 724, 739 (7th Cir. 2008)(" . . . the inadequate development of [plaintiff's] due process claim points in the direction of waiver."); *United States v. Alden*, 527 F.3d 653, 664 (7th Cir. 2008)("Because it is not the obligation of this Court to research and construct the legal arguments available to parties . . . these arguments are waived and warrant no discussion."); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991)("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."). Moreover, surely the interviewers who conducted the interviews and ranked the candidates are competent to testify where they ranked them. Results of interviews – the impressions the candidate left on the interviewers – are inherently subjective, and there's nothing wrong with subjective criteria entering into employment decisions. *See Stephens v. Erickson*, 569 F.3d 779, 786-87 (7th Cir. 2009); *Healy v. City of Chicago*, 450 F.3d 732, 742 (7th Cir. 2006); *Blise v. Antaramian*, 409 (continued...)

While the test and the interviews provided the background for the selection process, the Metropolitan Water Reclamation District Act, 70 ILCS 2605/4; 4.11 provided the rules for the selection process. The District's general superintendent is the appointing authority for civil service positions at the District like the principal civil engineer position. 70 ILCS 2605/4. When a vacancy occurs, the director of personnel certifies to the "appointing authority," the district's general superintendent, the names of the five candidates ranking highest on the eligible list for that position, or if the candidates have been ranked by category, the candidates within the highest ranking category. 70 ILCS 2605/4.11. If there are fewer than 5 candidates in the highest category, the director shall certify names from the succeeding categories until at least 5 names are provided to the appointing officer. *Id.* After the certification, general superintendent ". . . shall fill the position by appointment of one of the persons certified to him by the Director." *Id.*

The District concedes that the examination, itself, correctly evaluated the candidates' skills and qualifications for promotion, and that it resulted in a ranking of candidates in terms of excellence and competence. (*Plaintiff's Local Rule 56.1(b)(3)(C) Statement*, ¶ 106, 110; *Defendant's Response*, ¶ 106, 110). Yet, it would seem that the examinations were of little value in the promotion process, aside from initially ranking all the candidates who sought promotions. That initial ranking was important for only the very first promotion available, though, as once that candidate was selected

---

[3](...continued)
F.3d 861, 868 (7th Cir. 2005); *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998).

The hearsay question turns on the purpose for which the assessments are offered. If offered to prove that Ms. Kogucki was really not as qualified as her competitors, they are hearsay. If offered for some other relevant purpose, for example, to show that they were simply the basis upon which non-culpable decisionmakers relied to make promotions, they are not hearsay. *See Tennessee v. Street*, 471 U.S. 409 (1985); *Williamson v. United States*, 512 U.S. 594, 598 (1994); *United States v. Montana*, 199 F.3d 947, 950 (7th Cir.1999).

from the "highly qualified' category, the field – then at four – was then flooded with three times as many candidates – thirteen – from lower qualified categories who did more poorly on the examination.

This was acceptable as far as the statute provides, because once a candidate was selected from category A, there were fewer than five left, meaning the director of personnel could certify additional names from lower categories until category A had "at least" five names in it again. Of course, it would seem that the natural progression would have been to move the next highest candidate up each time to keep the category at five, thereby ensuring that the five most competent or excellent candidates were considered. After all, what if the top six candidates all scored above 90%, and the next highest score happened to be 75% or 60% or even lower? But the statute does not demand that. The result is that the examination seems to plays little or no role in ensuing promotions. Indeed, the District makes no mention of anyone's examination scores – the eligibility list places the candidates in alphabetical order (*Def.St.*, Ex. E) – but mentions interview score at every opportunity.

On July 27, 2005, the general superintendent, John Farnan, selected Joe Schuessler, one of the five highest ranking candidates – the A-category candidates, which included Ms. Kogucki – for a principal civil engineering vacancy in the engineering department. (*Def.St.*, ¶¶ 40-41; *Pl.Res.*, ¶¶ 40-41). He happened to have ranked first in the engineering department's interview rankings. (*Def.St.*, ¶ 41; *Pl.Res.*, ¶ 41). After Mr. Schuessler's appointment, less than five candidates remained in the A category, so the director of personnel certified the thirteen candidates in the B category. (*Def.St.*, ¶ 42; *Pl.Res.*, ¶ 42; 70 ILCS 2605/4.11).

Ed Staudacher got the next principal civil engineer vacancy, on August 4, 2005, which was

in the maintenance and operations department. (*Def.St.*, ¶ 43; *Pl.Res.*, ¶ 43). Mr. Staudacher placed in the B category on the eligible list based on his exam score, and ranked first on the maintenance and operations department's interview ratings. (*Id.*). Then came John Lemon and Maureen Durkin on November 23, 2005, who got positions in the engineering department. (*Def.St.*, ¶ 44; *Pl.Res.*, ¶ 44). Mr. Lemon was in the B category and seventh in his interview, while Ms. Durkin was in the A category and sixth in hers. (*Def.St.*, ¶ 45; *Pl.Res.*, ¶ 45). About a year later, Dan Collins filled the next vacancy, this time in the maintenance and operations department. (*Def.St.*, ¶ 45; *Pl.Res.*, ¶ 45). He was a B-category candidate who ranked second in department interviews. (*Def.St.*, ¶ 45; *Pl.Res.*, ¶ 45).

Ms. Kogucki isn't challenging any of those appointments. She's challenging the next four appointments, which occurred in 2007 and 2008. (*Def.St.*, ¶¶ 48-50; *Pl.Res.*, ¶¶ 48-50). In the first of these, Paul O'Brien was chosen for a vacancy in the engineering department on March 9, 2007. (*Def.St.*, ¶ 52; *Pl.Res.*, ¶ 52). Mr. O'Brien, like Ms. Kogucki, placed in the A category on the eligible list as a result of the exam, and placed in the C category of the engineering department's interview rankings. (*Def.St.*, ¶ 52; *Pl.Res.*, ¶ 52). He ranked two places higher than Ms. Kogucki in the interviews. (*Id.*). His new appointment was in the process facilities division, where he had worked – and gained experience – since April 2005. (*Id.*). His position there was directly subordinate to his new position. (*Def.St.*, ¶ 54; *Pl.Res.*, ¶ 54; Kogucki Deposition, at 182-83). He was recommended by Mr. Sobanski, Mr. Kunetz, and the section head at the division; the general superintendent "approved the recommendation." (*Def.St.*, ¶¶ 58-59; *Pl.Res.*, ¶ 58-59). Notably, at the time of Mr. O'Brien's promotion, Mr. Kunetz – Ms. Kogucki's nemesis, the man she complained about and never wanted to work for again – was in charge of the division. (*Def.St.*, ¶ 56; *Pl.Res.*, ¶ 56).

Ms. Kogucki admits that she knows nothing of Mr. O'Brien's work performance (*Def.St.*, ¶ 57; *Pl.Res.*, ¶ 57). but testified at her deposition that she was more qualified for the position because Mr. O'Brien had no design experience, and had only been promoted to senior civil engineer as of April of 2005, whereas she had been a senior civil engineer since 2000. She also submitted that he only had two years in design at that time – which seems to contradict her testimony that he had no design experience –and she had seven. And, she claimed to have had her own design projects which made her better qualified to manage others' projects. (*Def.Res.*, ¶59; Kogucki Deposition, at 184-187).

The next candidate to get a principal civil engineer position was Adam Gronski on May 24, 2007. (*Def.St.*, ¶ 64; *Pl.Res.*, ¶ 64). He was placed in the technical projects unit of the maintenance and operations department. (*Id.*). Mr. Gronski was a B-category candidate, who faired well in the interviews – placing third – and was rated "exceptionally well qualified." (*Def.St.*, ¶ 65; *Pl.Res.*, ¶ 65). He was recommended by Manju Sharma, an assistant chief engineer in the maintenance and operations department, and Osoth Jamjun, chief of maintenance operations – the man Ms. Kogucki complained to about the plays. (*Def.St.*, ¶ 61; *Pl.Res.*, ¶ 61).[4] Neither Ms. Kogucki nor Mr. Gronski had ever worked in the technical projects unit. (*Def.St.*, ¶ 66; *Pl.Res.*, ¶ 66). The parties dispute the varying types of experience the two candidates had in varying areas, but there is nothing in the record regarding what type of experience the job demanded. (*Def.St.*, ¶ 67-71; *Pl.Res.*, ¶ 67-71). For

---

[4] Ms. Kogucki objects to the use of recommendations as evidence on hearsay grounds. The objection is undeveloped as was the objection regarding interview assessments. *Supra*, n.1. As such, the same case law applies. This objection, however, is a bit more understandable. While the "truth" of the recommendations does not matter in some aspects -- as to what someone thinks of a candidate as an employee, for example – it does in other that are quantifiable or are objective, such as a candidate's actual experience or the actual requirements for the position being discussed.

example, the District states that Mr. Sharma told Ms. Kogucki that Mr. Gronski was a better fit because he had EPA experience – more accurately, that Ms. Kogucki testified as much. (*Def.St.*, ¶ 71; *Pl.Res.*, ¶ 71). But there is nothing in the record to indicate he did, or even that the job required it. There are similar problems with the District's references to wetlands experience, biosolids experience, and plant design experience. (*Def.St.*, ¶ 69; *Pl.Res.*, ¶ 69).

Kurt Spaletto got the next open position, with construction division of the engineering department. (*Def.St.*, ¶ 73; *Pl.Res.*, ¶ 73). He was recommended by Mr. Sobanski and Kenneth Kits, an assistant chief engineer. (*Def.St.*, ¶ 73; *Pl.Res.*, ¶ 73). Mr. Spaletto was yet another B-category candidate, but he ranked twelve places higher than Ms. Kogucki in the interview rankings, placing third. (*Def.St.*, ¶ 76; *Pl.Res.*, ¶ 76). He "had a lot of experience as an engineer in the Construction Division;" Ms. Kogucki worked in Construction between 2001 and 2002, about a year and a half. (*Def.St.*, ¶ 77; *Pl.Res.*, ¶ 77).

Next there was Ann Ko, who went to the general division of the maintenance and operations department on another recommendation from Mr. Sharma and Mr. Jamjun. (*Def.St.*, ¶ 78; *Pl.Res.*, ¶ 78). Ms. Ko placed in the B category on the eligible list and ranked five places lower than Ms. Kogucki in the interviews, placing sixteenth, third from the bottom. (*Def.St.*, ¶ 82; *Pl.Res.*, ¶ 82). The District submits that as an Asian female, she fulfilled an EEO recommendation for a minority and/or female appointment. Of course, so would have Ms. Kogucki. (*Def.St.*, ¶ 83; *Pl.Res.*, ¶ 83). And there is a dispute over Ms. Ko's experience, and there is nothing in the District's statement to establish what the job entailed, only references to biosolids and "LAMSA," which are unexplained. Ms. Ko had filed EEOC charges against the District in 2003 and 2004 (*Def.St.*, ¶ 86; *Pl.Res.*, ¶ 86), but there's nothing in the record to indicate anyone in authority vowed to retaliate against her as Mr.

14

Sobanski's statements suggested would happen to Ms. Kogucki.

## II.
## ANALYSIS

### A.
### Summary Judgment

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the nonmoving party's evidence "'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). Credibility determination must be left for the fact-finder. *Id.* at 552.

But this favor toward the nonmoving party does not extend to drawing "[i]nferences that are supported by only speculation or conjecture." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir.2008). The nonmoving party "'must do more than raise some metaphysical doubt as to the material facts; [she] must come forward with specific facts showing that there is a genuine issue for trial.'" *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir.2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Where the nonmoving party bears the burden of proof at trial, he must present specific facts showing a genuine issue to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir.1996). A genuine issue of material fact exists, precluding summary judgment, "only if sufficient evidence favoring the nonmoving party exists to permit a jury to return

15

a verdict for that party." *Sides v. City of Champaign,* 496 F.3d 820, 826 (7th Cir.2007).

<h2 style="text-align:center">B.</h2>

Title VII prohibits an employer from discriminating against an employee who has "opposed any practice" made unlawful by Title VII or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). "The anti-retaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms ... by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006). That means internal complaints – such as the one Ms. Kogucki made in 2003 regarding the play – are covered. *Andonissamy v. Hewlett-Packard Co.,* 547 F.3d 841, 851 (7th Cir. 2008). But the underlying complaint or charge can't be frivolous or utterly baseless. *Mattson v. Caterpillar, Inc.,* 359 F.3d 885, 890-91 (7th Cir. 2004). The employee must reasonably believe, in good faith, that she has suffered discrimination. *Tate v. Executive Management Services,* 546 F.3d 528, 532 (7th Cir. 2008); *Mattson,* 359 F.3d at 890-91.

Ms. Kogucki's underlying complaint would likely not have survived as a discrimination claim. She accidentally came across her supervisor's play in her supervisor's computer folder while she was searching for a form contract. If not private, the play was at least not being exhibited in the workplace for all to see whether they liked it or not. Plus, it was an isolated incident. All in all, any discrimination claim was probably doomed to failure. *See Lucero v. Nettle Creek School Corp,.* 566 F.3d 720, 732 (7th Cir. 2009)(plaintiff finding 20 pornographic magazines did not create a hostile environment because it was an isolated incident); *Coolidge v. Consolidated City of Indianapolis,* 505

16

F.3d 731, 734 (7ᵗʰ Cir. 2007)(accidentally viewing of pornographic video depicting necrophilia did not create hostile environment).

Moreover, it was an easily avoidable incident. First, it would immediately have been obvious to an experienced engineer like the plaintiff that what she was reading was not a contract or bid. Nonetheless, she read the *entire* play. If the opening passages were offensive, it is hard to understand why she would have kept reading, for she certainly would have known that what she was reading was not what she was looking for. What is more inexplicable is that she printed the play and *read it again*, before lodging an internal complaint. That's akin to someone coming across a racist cartoon in their supervisor's desk drawer, copying it, and posting it in their own cubicle, and then crying foul.[5]

Then, when Ms. Kogucki asked for a transfer, she was accommodated the next day. That would likely scuttle her claim as well. *See Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 635 (7ᵗʰ Cir. 2009)(employer avoids liability for hostile environment where it takes prompt, appropriate corrective action); *Lapka v. Chertoff*, 517 F.3d 974, 984 (7ᵗʰ Cir. 2008). But, to make matters worse, Ms. Kogucki changed her mind and declined the very accommodation she requested. But retaliation is not immunized if the charge or opposition by the victim of the retaliation lacks legal merit. *Nair v. Nicholson*, 464 F.3d 766, 769 (7ᵗʰ Cir. 2006). Whether there was a basis to grant summary judgment based upon the seeming frivolousness of the complaint is irrelevant since this was not an

---

[5] Maybe Ms. Kogucki has "eggshell" sensibilities and was truly offended by a fictional account that had no relationship to her or anyone she knew. Maybe she could not divorce the depiction of the female character or characters in the play from the way the playwright actually considers and treats women in the workplace. Maybe when she finds something truly offensive, she cannot look away, as if it were the proverbial grisly accident. Maybe she reasonably believed in good faith that the practice she opposed violated Title VII. *Tate*, 546 F.3d at 532.

issue the District raised or developed – meaning Ms. Kogucki did not have an opportunity to present her side – and thus, it cannot be the basis for summary judgment here. *Bodenstab v. County of Cook*, 569 F.3d 651, 661 (7th Cir. 2009); *Golden Years Homestead, Inc. v. Buckland*, 557 F.3d 457, 462 (7th Cir. 2009); *Osler Institute, Inc. v. Forde*, 333 F.3d 832, 837 (7th Cir. 2003).

## C.

Ms. Kogucki can avoid summary judgment on her retaliation claim in two ways: the direct method or the indirect method. *Coffman v. Indianapolis Fire Dept.*, 578 F.3d 559,563 (7th Cir. 2009); *Henry v. Jones*, 507 F.3d 558, 566 (7th Cir. 2007); *Brewer v. Board of Trustees of University of IL*, 479 F.3d 908, 915 (7th Cir. 2007). Under the direct method of proof, she must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action taken by the employer; and (3) there was a causal connection between the two. *Hobbs v. City of Chicago*, 573 F.3d 454, 463 (7th Cir. 2009); *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 404 (7th Cir.2007). There is no dispute here that Ms. Kogucki engaged in statutorily protected activity – her internal complaint – or that she suffered from an adverse action – failure to get a promotion. The issue, then, is the causal connection.

Employing the direct method, Ms. Kogucki can rely on two types of evidence to show that her protected activity motivated the District's action: "direct evidence" or "circumstantial evidence." *Hobbs*, 573 F.3d at 463; *Amrhein v. Health Care Service Corp.*, 546 F.3d 854, 858 (7th Cir. 2008) This is where some of the confusion alluded to earlier comes in. Direct evidence is the kind of evidence that will prove the fact in question without reliance upon inference or presumption if it is believed by the fact-finder. *Hobbs*, 573 F.3d at 463; *Amrhein*, 546 F.3d at 858. It typically involves an admission, *Hobbs*, 573 F.3d at 463; *Amrhein*, 546 F.3d at 858, or near-admission, *Hasan v. Foley*

& *Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008); *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008); *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006), by the decision maker regarding the retaliatory intent. *Hobbs*, 573 F.3d at 463; *Amrhein*, 546 F.3d at 858. Because that tends to be rare, a plaintiff can also offer circumstantial evidence, which allows the fact-finder to infer intentional discrimination by the decisionmaker, typically through a longer chain of inferences. *Hobbs*, 573 F.3d at 463; *Amrhein*, 546 F.3d at 858.[6]

The evidence here comes from statements attributed by the plaintiff to Mr. Sobanski, the District's Chief Engineer. When Ms. Kogucki inquired as to the upcoming application process for the next round of promotions, he allegedly responded, "you will never be promoted because of your complaints."[7] The District contends that this is not direct evidence, because it does not prove discriminatory conduct on the part of the employer without reliance on inference or presumption. It submits that it is nothing more than a stray remark, not made by the decisionmaker, and distant in time from the challenged promotions.

First, if the statement in question is not an admission or near-admission, it is not clear what it would be. It directly links the adverse action – failure to promote – to the prohibited conduct –

---

[6] Circumstantial evidence may be more certain, satisfying and persuasive than direct evidence. *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960). *See also Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *Branion v. Gramly*, 855 F.2d 1256 (7th Cir. 1988)("The evidence was circumstantial. But oh what circumstances.").

[7] The District concedes that Ms. Kogucki testified that this was what Mr. Sobanski told her. In its opening brief, it refers to the statement as the "alleged" statement, and by the time of its reply brief, it calls it the "disputed" statement. For now, there is no evidence to dispute it. Just so there is no confusion on the District's side, Ms. Kogucki's testimony about the statement is perfectly acceptable evidence, and is so far uncontroverted. It "goes directly to the heart of her claim that the failure to promote her was based on her [complaints]. Whether this statement was actually made, and its import, is for a jury to decide. *Volovsek v. Wisconsin Dept. of Agr., Trade and Consumer Protection*, 344 F.3d 680, 690 (7th Cir. 2003).

retaliation for complaints. thus, it cannot be characterized as a "stray remark." *See Schafer v. Maryland Dept. of Health and Mental Hygiene*, 2009 WL 5183692 at *2 (4th Cir. 2009). *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989)(O'Connor, J., concurring); *Emmel v. Coca-Cola Bottling Co. Of Chicago*, 95 F.3d 627, 632 (7th Cir. 1996)(statement not a stray remark when it directly addressed the action at issue); *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997)(statement was a stray remark because it was not directly linked to decision to terminate plaintiff); *Stopka v. Alliance of American Insurers*, 141 F.3d 681, 688 (7th Cir. 1998)(comment during casual dinner conversation not related to challenged decisions on salary or working conditions); *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997)("Still, remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality"); *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 183 (3rd Cir. 2009)(statement, "Well, you ain't nothing but the N word"and responded in the affirmative when asked if he was calling her a "nigga," not a stray remark).

No inference is needed to figure out what Mr. Sobanski was threatening. It is not as though he said, "I hate complainers," and later on, Ms. Kogucki lost out on a promotion. That would be what the District and the cases refer to as a "stray remark," which is generally categorized as an ambiguous statement. *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1115 (7th Cir. 2009); *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir.2007). There is certainly nothing ambiguous about what Mr. Sobanski said. It was categorical. One doesn't have to wonder whether, if he hates complainers, if it would enter into his thinking about promotions – he said it would in no uncertain terms. The difference is perhaps best explained in *Gorence v. Eagle Food Centers, Inc.*,

242 F.3d 759 (7th Cir. 2001):

> No application of law to facts, however, is ever quite so simple as setting out principles of law. After over three and a half decades of laws prohibiting employment discrimination in one form or another, employers are fairly unlikely to be caught making statements such as, "I fired Judy because she was an old woman." Workplaces remain, though, places filled with persons who express thoughts which often reveal bias or ignorance. Those persons can be caught saying, for example, something like, "Old women are hard to deal with." The first statement proves intentional discrimination; the second, without more, does not.

242 F.3d at 762. Mr. Sobanski's statement, if in fact it was made and that will be for the jury to determine, wasn't a mere insult; it was a vow to retaliate against Ms. Kogucki for complaining about what she thought was a hostile work environment.

Second, such a remark need not be uttered by *the* decision-maker. The District argues that for any comment – admission, near-admission, or stray remark – to be probative, Ms. Kogucki would have to show that it was the District's general superintendent who said it. (*Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment*, at 4). The District's own statement of facts even belies its argument, as it reveals that the General Superintendent approves the recommendations of others, (*Def.St.*, ¶¶ 59), and that the decisions tend to be made by several people. (*Def.St.*, ¶ 70).

Moreover, the cases uniformly hold that it is enough that the statement came from someone who influenced the challenged decision, *Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 829 (7th Cir. 2008), was involved in it, *David v. Caterpillar, Inc.*, 324 F.3d 851, 861 (7th Cir. 2003), or had input into it. *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 528 (7th Cir. 2008)(". . . a court [need not] ignore comments made by someone who is not directly responsible for an employee's supervision. . . . [they] are relevant if they are made by someone who provided input into the adverse

employment decision."); *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 433 (7th Cir. 2005). Even if the statement came from, not a supervisor or department head, but a co-equal employee without any formal authority, it can be shown that the employee "uses her "singular influence" over an employee who does have such power to harm the plaintiff for racial reasons . . ." *Brewer v. Board of Trustees of University of IL*, 479 F.3d 908, 917 (7th Cir. 2007).

Here the statement came from the District's chief engineer, a position of substantial authority. Moreover, Mr. Sobanski was one of just three higher-ups who recommended the applicants for two of the challenged promotions and, according to the District, the general superintendent simply "approved the recommendation[s]." (*Def.St.*, ¶¶ 59, 73; *Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment*, at 4). Clearly, based on the Local Rule 56.1 submissions, Mr. Sobanski can be said to have had input into or influence over the promotion decisions.

Finally, the timing of the statement does not present the problem for Ms. Kogucki that the District sees. This is a rather tricky area of Title VII jurisprudence, however, and the District's arguments to the contrary are understandable. The element of timing comes into the calculus since stray remarks, ambiguous statements, or derogatory comments can be circumstantial evidence of intent or motive. *Brown*, 581 F.3d at 183. *See Nagle*, 554 F.3d at 1115; *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 575-76 (7th Cir. 2003). In that context, propinquity becomes significant because the farther removed the statement is from the complained of decision, the weaker the evidentiary inference of intent and motive.

22

The relevant case law traces its origins to the plurality opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and Justice O'Connor's concurrence. The plurality opinion held that:

> [r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender [here race] in making its decision.

490 U.S. at 251. Justice O'Connor's concurring opinion expanded on this theme by stating:

> Stray remarks in the work place . . . cannot justify requiring the employer to prove that its . . . decisions were based on legitimate criteria. Nor can statements by non-decision makers or statements by decision makers unrelated to the decisional process itself suffice to satisfy the plaintiff's burden in this regard.

409 U.S. at 277 (O'Connor, J., concurring).

It is well to recall that the case was not dealing with categorical statements like those Ms. Kogucki claims were made by Mr. Sobanski. Rather, it involved derogatory comments. To be significant, they had to be made by a decision-maker, and they had to be related to the decisional process. Nothing quite yet about timing, but that would later become one way to relate a remark to the decisional process – *if* the remark didn't relate to it in and of itself. *See Adelman-Reyes v. Saint Xavier University*, 500 F.3d 662, 666-67 (7th Cir. 2007)("stray remarks that are neither proximate *nor* related to the employment decision are insufficient to defeat summary judgment.")(emphasis supplied)); *Sun v. Board of Trustees of University of IL*, 473 F.3d 799, 813 (7th Cir. 2007)(same); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 576 (7th Cir. 2003)("The less direct the connection between the comment and the employment action-that is, if the comment was not made in temporal proximity to the employment action, *or* if the comment was not made in reference to that action-the less evidentiary value the comment will have."(emphasis supplied)); *Geier*, 99 F.3d at 242 ("To be probative of discrimination, isolated comments must be contemporaneous with the discharge

23

or causally related to the discharge decision making process.").[8]

Here, the "remark" at issue clearly related Ms. Kogucki's complaint to the promotional process – that was the topic of their exchange – and it was made by someone with influence or input into the promotional process. It was simply not the kind of remark the cases refer to as a "stray remark." *See e.g., Nagle*, 554 F.3d at 1115 (plaintiff numbered among "those old white motherf---ers"); *Petts*, 534 F.3d at 721 (female plaintiff was "acting like a man"); *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489 (7th Cir. 2007)(ADEA plaintiff "looked old and tired"); *Volovsek v. Wisconsin Dept. of Agr., Trade and Consumer Protection*, 344 F.3d 680, 690 (7th Cir. 2003)("keeping [women] barefoot and pregnant"); *Gifford v. Lone Star Steel Co.*, 170 F.3d 183 (5th Cir. 1993)("old fart"); *Hammons v. Computer Programs & Systems, Inc.*, 2006 WL 3627117 (S.D.Ala. 2006)("bitch;" "company bitch").

Mr. Sobanski's response to Ms. Kogucki's inquiry about promotions was clear, more along the lines of "[y]ou're too old to work here," *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006), or the termination letter that a FMLA plaintiff received stating, "[i]t was determined that you miss too much work to meet the essential functions of your present assignment." *Lewis v. School Dist. #70*, 523 F.3d 730, 742 (7th Cir. 2008).

---

[8] As noted in the opening, however, there is something for everyone in Title VII jurisprudence. There are a few cases, such as *Bahl v. Royal Indem. Co.*, 115 F.3d 1283 (7th Cir. 1997), that have held that stray "comments cannot defeat summary judgment in favor of an employer unless they are both proximate and related to the employment decision in question." *Id.* at 1293. But *Bahl*, at least, relied on *McCarthy v. Kemper Life Ins. Companies*, 924 F.2d 683, 686-87 (7th Cir. 1991), which actually held that "[u]nless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of a discriminatory discharge." *McCarthy v. Kemper Life Ins. Companies*, 924 F.2d 683, 686 (7th Cir. 1991). In *McCarthy*, the court went on to note that the bulk of the comments the plaintiff offered as evidence were not made by decisionmakers, and that the few that may have been were simply unsupported allegations, insufficient for summary judgment purposes, and were in reference not to the plaintiff's termination, but his EEOC settlement.

Timing is important in the context of a stray remark, because it tends to make the inference of discriminatory intent, stronger; the closer in time to the adverse action, the easier the inference that the comment is linked to the motive behind the action.[9] When the adverse action is directly linked to the statement of prohibited animus within the statement itself – "you'll never be *promoted* because of your *complaints* – timing is not so significant. Or phrased differently, temporal proximity is, by definition, satisfied. *See Brown*, 581 F.3d at 183. The District has not provided any case where timing was discussed in connection with an admission of near admission; only in connection with circumstantial evidence such as derogatory remarks or epithets.[10]

A bit more on timing in this instance. What prompted Mr. Sobanski's alleged comments was

---

[9] Title VII did not outlaw prejudice or bigotry. It outlawed adverse employment decisions precipitated by prejudice or bigotry. The same is true of Title VII's retaliation provisions. People who complain about every perceived slight or see racism or sexism behind every one of their disappointments, may well be vexing to their employers. But their good faith complaints can't be a reason to fire them or promote them. So an employer is not liable for derogatory comments, it is only liable for deciding whom to hire, promote, or fire based on race, gender, religion, or any other protected category. A derogatory comment is important only as a piece of evidence, and it's much more probative when it proceeds the challenged action by a brief passage of time. The case law on this point cannot be saying that, when a supervisor says something derogatory about women, and fires a female employee two years later, the supervisor has had a "come-to-Jesus" moment in the interim and his decision could not possibly have been motivated by sexism. In the real world outside the courtroom, he most likely he didn't change his feelings, and it is still possible they were the reason for his employment decision. It is simply that the inferential link is tougher to make after the passage of time than if he announced that he was never promoting a woman, which is the kind of statement at issue here.

[10] The District points to two cases which it suggests hold that an admission or near-admission – like a stray remark – must also be contemporaneous with the adverse action: *Conley v. Village of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000) and *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996). (*Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment*, at 4). But neither case supports the District's contention. *Conley* specific stated that the plaintiff had not presented any direct evidence. 215 F.3d at 709, 711. When the plaintiff's supervisor said he would be "relentless" toward plaintiff, it clearly wasn't the type of categorical statement at issue here. And in *Geier*, the plaintiff's supervisor told her "[h]ave all the kids you would like-between spring, summer, and fall. I will not work your territory during the winter months," during a casual conversation. It would have required a series of inferences to link that to the plaintiff's eventual dismissal. 99 F.3d at 242.

Ms. Kogucki's inquiry about the upcoming promotion evaluations. These were tests and interviews that would determine eligibility for promotion for the *next three years*. Clearly, Mr. Sobanski's alleged comment was, in essence, a statement that she had no chance – not then, not in a year, not in two, and not in three. It was a statement that whenever the promotions were made, she would not be among those promoted – not ever. The fact that the promotions at issue might occur one week, or one year, or three years after the remark was a product of the system in place. And, make no mistake, Mr. Sobanski told Ms. Kogucki, "never." So, while Mr. Sobanski's statement might have been remote in time from the specific promotions Ms. Kogucki challenges, it was contemporaneous with the overall process. But, again, timing is not as significant here because this was not a stray remark, but a statement in the category of what the cases classify as an admission or near-admission.

## CONCLUSION

Based on the parties' factual statements and briefs, the District has failed to demonstrate that it is entitled to summary judgment on the direct-method portion of Ms. Kogucki's claim, and because a plaintff may avoid summary judgment by way of the direct or indirect method, the District's motion for summary judgment [# 41] is DENIED.

It should be emphasized that nothing said in this Opinion should be construed as accepting the truthfulness of any position taken by either party in the summary judgment proceeding. And that includes the question of whether the statement attributed to Mr. Sobanski actually was made. These are questions that are solely for the jury to determine. That judgment will be based upon the entirety of the evidence presented to them and on their assessment of the credibility of the witnesses.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 3/17/10

26